IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

AILEEN MURPHY,

        Plaintiff,

vs.                                          No. CIV 08-25 RHS/LFG

DELOITTE & TOUCHE GROUP
INSURANCE PLAN; METROPOLITAN
LIFE INSURANCE COMPANY,

        Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION TO PERMIT LIMITED DISCOVERY**

THIS MATTER is before the Court on the mandate of the United States Court of Appeals for the Tenth Circuit issued on September 30, 2010 [*see* Doc. 65]. In a opinion filed September 8, 2010, the circuit court directed this Court to vacate its order denying Plaintiff's discovery request, as well as its order granting summary judgment, and to reconsider the discovery request in light of the guidelines set forth in the opinion. Murphy v. Deloitte & Touche Group Ins. Plan, – F.3d –, 2010 WL 3489673 (10th Cir. Sept. 8, 2010).

Plaintiff Aileen Murphy ("Murphy") was a participant in the Deloitte & Touche Group Insurance Plan, which is governed by the Employee Retirement Income Security Act ("ERISA"). Because Metropolitan Life Insurance Company ("MetLife") acted as the insurer and administrator for the plan, it operated under an "inherent dual role conflict of interest." Murphy, *supra*, at *1.

After MetLife denied Murphy's claim for long-term disability benefits under the plan, she

sought judicial review of that decision pursuant to 29 U.S.C. § 1132(a)(1)(B).  The general rule in ERISA cases is that discovery is not permitted; rather, the district court is to review the plan administrator's decision on the administrative record alone.  Chambers v. Family Health Plan Corp., 100 F.3d 818, 823-24 (10th Cir. 1996); Weber v. GE Group Life Assurance Co., 541 F.3d 1002, 1011 (10th Cir. 2008); Murphy, *supra*, at *4 and cases cited therein.

Shortly after the administrative record was submitted in this case, Murphy filed a Motion to Permit Limited Discovery and Modify Scheduling Order [Doc. 22].  In this Motion, Murphy asked the Court to make an exception to the general rule and permit her to conduct discovery designed to obtain and present evidence regarding MetLife's conflict of interest.  Murphy argued that she needs what she described as "limited" discovery into the effect of the apparent conflict of interest on the fairness of the administrator's decision denying her benefits.  "If an administrator operates under a dual role conflict of interest, the district court must always weigh the conflict of interest in its abuse of discretion analysis, but it must allocate the conflict more or less weight depending on its seriousness."  Murphy, *supra*, at *5.

Murphy sought discovery on such matters as the existence of the conflict of interest, the extent of the conflict, the actions taken by the plan administrator in denying her claim, and whether those actions were motivated by MetLife's customs, practices and culture.  Murphy's discovery requests were broad and sweeping.  She requested the following:

> Murphy requests an order permitting her to take Rule 30(b)(6) depositions of Metlife and RRS [Reed Review Service], and individial [sic] depositions of Drs. Walker and LaForce [RRS doctors Carol Walker, Ph.D. and Bruce LaForce, M.D., who reviewed Murphy's medical records at MetLife's request], in order to obtain the following information:
>
>> 1.  How does Metlife construe or use the term "objective medical evidence" or "objective evidence"?

        a. Since the cases show that it clearly does not construe this term the same way from case-to-case;

            i. What do Metlife's Guidelines say about this issue? Are CFS, fibromyalgia, pain, psychiatric disorders, and other self-reported conditions and/or symptoms treated differently in the Guidelines?

            ii. Does Metlife define "objective evidence" to include clinical exam and physician findings (such as the Fibromyalgia Trigger Point Test or the GAF)? Or in [sic] such evidence characterized as "subjective" evidence.

2. Do Metlife's contracted reviewing doctors use these terms the same way Metlife uses/understands them?

3. Does Metlife apply these terms consistently from case to case?

4. Since Metlife obviously is capable of drafting policies that exclude disabilities that cannot be established without objective medical evidence, is it reasonable for Metlife to construe a policy that doesn't have that limitation as nonetheless requiring objective medical evidence?

5. Is Metlife demanding that which medical science cannot provide?

6. To the extent that Metlife is not demanding objective medical evidence, as potentially applicable here, of pain or mental disability, but only demanding objective medical evidence that Murphy could not do her own occupation, what kind of objective medical evidence did it require – and why didn't it tell Murphy? Furthermore, as discussed in *Saffron*, is such "objective" medical evidence reasonably germane to the issue.

              \*\*\*

7. To obtain Metlife's Claims Management Guidelines, and all versions in effect from 2002-present, as they pertain to the objective evidence issue; specifically, all general applicable guidelines and all specific guidelines, if they exist, as they

pertain to chronic back disorders, such as degenerative disc disease, and to mental and nervous disorders, with, to the extent it exists, specific reference to major depressive disorders.

8. To obtain an explanation, of why it is that Metlife administers and/or issues policies that expressly exclude subjective complaints, and yet apparently construes this policy (and other similar policies) without such language the same way it construes policies with the express exclusion.

9. Both Walker and LaForce wrote they relied upon guidelines and or content obtained from the *Medical Disability Advisor, Fifth Edition*, published by the Reed Group. To obtain the guidelines or the content on which they relied.

10. To obtain RRS's contracts with and instructions to Walker and LaForce, (do they have contracts and/or instructions that require reviewing doctors to utilize given standards of medical evidence), and all standard form contracts, instructions, guidelines, arrangements, etc., between these doctors and RRS.

11. To obtain the contracts, instructions, guidelines, and standards between Metlife and RRS.

12. To obtain payment information between Metlife and RRS for the period from – 2005 through 2007, and between RRS and Walker and LaForce for the same span of time.

13. To obtain data regarding the "track records" of Dr. Walker and LaForce – how often they have been retained by RRS; how often they concluded claimants were not disabled and how often they concluded claimants were disabled.

14. The only documentation of Murphy's GAF in this file is on AR 202; an admitting diagnosis with a GAF of 35 and a discharging diagnosis with a GAF of 45. There is also on AR 200, a Symptom Distress Scale of 39 at admission and 28 at discharge. To obtain, if they exist, any standards or guidelines utilized by Metlife regarding GAF and SDS.

15. To obtain Metlife's Claims Management Guidelines, and all versions in effect from 2002-present, as they pertain to the

> denial of benefits, notices – with special reference to what to tell claimants about what they need to provide Metlife to perfect their appeals and why, to be authenticated by Metlife.
>
> 16. In order to make it possible for Murphy to subpoena Dr. Walker and Dr. LaForce, Metlife must be ordered to provide their addresses; their reports are on RRS Letterhead.

[Doc. 23, at 20-24].

In the original Order Denying Plaintiff's Motion to Permit Limited Discovery [Doc. 39], this Court held that discovery was unnecessary in this case, because MetLife admitted that it serves in the dual capacity of plan administrator and insurer. [Answer, Doc. 13, ¶ 21]. Thus, the conflict of interest is "apparent on the face of the administrative record or . . . . stipulated to by the parties," Farley v. Ark. Blue Cross & Blue Shield, 147 F.3d 774, 776 n.4 (8th Cir. 1998), and further discovery into the existence of the conflict is not required. Rather, the reviewing court will take the conflict into account in its review of the administrative record by being less deferential to the administrator's discretion. Spangler v. UNUM Life Ins. Co. of Am., 38 F. Supp. 2d 952, (N.D. Okla. 1999).

This Court further held that the wide-ranging discovery requested in this case would be contrary to the congressional scheme to provide uniform standards, procedures and efficiency in the processing and review of ERISA claims. [Id., at 8-9].

After Judge Scott granted summary judgment in favor of Defendants, Murphy took an appeal to the Tenth Circuit in which she argued that this Court should have granted her discovery request. The Tenth Circuit took the opportunity of this appeal to note that its cases "have failed to provide clear guidance to the district court regarding the appropriate standard for resolving discovery requests in these types of cases." Murphy, *supra*, at *4. As the circuit noted:

> However, even as we have told district courts to limit their analysis

> to the administrative record, we have also instructed the district courts to assess the effect of a dual role conflict of interest in a manner that seems incompatible with a flat prohibition on extra-record discovery and supplementation. If an administrator operates under a dual role conflict of interest, the district court must always weigh the conflict of interest in its abuse of discretion analysis, but it must allocate the conflict more or less weight depending on its seriousness. [Citation]. But, without discovery, a claimant may not have access to the information necessary to establish the seriousness of the conflict. Similarly, the administrator may not be fully able to rebut a claim of conflict by showing that it "has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances." [Citation]. And, if the district court cannot consider material beyond the administrative record, it may not be able to fulfill its judicial task of allocating the proper weight to the conflict of interest. If the administrative record does not specifically address these issues and if we flatly prohibited the consideration and discovery of information outside the administrative record, the district court may not be able to make a fully informed analysis that properly weighs the conflict of interest.

Id., at *5.

While making clear that a claimant may not supplement the record with substantive evidence of her eligibility for benefits, the circuit court held that discovery may be proper if it could help to establish "the scope and impact of the dual role conflict of interest." Id., at *8. The claimant should be allowed an opportunity to show "the seriousness of the conflict," and the plan administrator should be allowed an opportunity to show that it has taken active steps to reduce potential bias and to promote accuracy, for example by walling off claims administrators from those interested in the firm's finances. Id., at *5.

The court provided some examples of ways to make these showings. The claimant may wish to show "a history of biased administration of claims" – for example, evidence that the insurer pressured its employees and physicians to deny clams without proper analysis. And the claimant, and even the administrator, may wish to present evidence of the claims assessment process," that

6

is, "the policies and procedures used by the administrator to make its decision." Id., at * 7 [internal punctuation omitted].

At the same time, the circuit court warned that discovery requests in ERISA cases are governed by FED. R. CIV. P. 26(b) which restricts discovery to relevant information, reasonably calculated to lead to the discovery of admissible evidence, which is not cumulative nor overly burdensome or costly to obtain. And, further, the circuit court reminded the district courts that they must "always bear in mind that ERISA seeks a fair and informed resolution of claims." Id., at *8-9.

Thus, district courts are to ensure that the burden remains on the party seeking to supplement the record to show the necessity for the discovery, and they must weigh the burden and cost of the requested discovery against its benefits. For example, "the benefit of allowing detailed discovery related to the administrator's financial interest in the claim will often be outweighed by its burdens and costs because the inherent dual role conflict makes that financial interest obvious . . . . ." Id., at *9. However, discovery may be appropriate into "the extent to which the administrator has insulated its decisionmaking process from its financial interest," for example, "discovery related to how an administrator structures its compensation for the independent physicians that reviewed a plan participant's claim might be appropriate to determine if the administrator took steps to insulate the independent reviewers from the administrator's obvious financial interest." Id., at *9 & n.7.

And if the record reveals a lack of thoroughness in the administrator's review, the court may be able to allocate significant weight to the conflict without any further discovery. Id., at *9.

As to the present case, the court held:

> The magistrate judge began his analysis by acknowledging that "[d]iscovery may be permitted in ERISA cases to ascertain whether a conflict of interest exists" . . . . But after some discussion that discovery may be permitted in some circumstances, the magistrate judge concluded that because MetLife conceded it served as both the

>administrator and insurer of the Plan, its conflict of interest was "now 'apparent' [and] further discovery into the conflict [was] not required" . . . . He appears to have read our admittedly unclear case law as prohibiting any discovery related to the seriousness of an inherent dual role conflict of interest or efforts to mitigate any conflict of interest. The magistrate judge's conclusion, however, paints with too broad a brush. Ms. Murphy might be able to argue that discovery, appropriately circumscribed, is appropriate to allow her to determine, and present evidence on, the seriousness of the inherent conflict and the likelihood that it jeopardized MetLife's decisionmaking process in her case . . . . Of course, MetLife will have an opportunity to respond with its own evidence that the conflict did not jeopardize its decisionmaking process.

Id., at *10 & n.8.

Furthermore, all discovery, whether arising in an ERISA case or not, is subject to the cost-benefit proportionality factors set out in FED. R. CIV. P. 26(b)(2)(C) and 26(g)(1)(B)(iii). The Court is required to limit discovery if it determines that the information sought is unreasonably cumulative, duplicative or can be obtained from other sources that are more convenient, less burdensome or less expensive. The Court may also limit the proposed discovery if the burden or expense of production outweighs its likely benefit, considering the needs of the case, the amount in controversy and the importance of the issue at stake.

With these admonitions in mind, the Court turns to the discovery requested by Murphy in this case. Murphy asks that the Court enter an Order permitting her to take broad and sweeping Rule 30(b)(6) depositions of MetLife and Reed Review Service ("RRS"), a company with which MetLife contracts to provide medical record review service. As noted above, RRS doctors Carol Walker, Ph.D. and Bruce LaForce, M.D. reviewed Murphy's medical records at MetLife's request. Murphy also wants to take the individual depositions of Drs. Walker and LaForce. Murphy provides 16 items of information she expects to obtain from these four depositions. The listing requires detailed information on potentially hundreds if not thousands of other claims and cases.

It is apparent that Murphy contemplates wide-ranging depositions, along with broad document discovery. This kind of discovery is simply not in keeping with Congress's intent that ERISA be an expeditious, economical and efficient proceeding to resolve claims, nor with the circuit court's decision to allow necessary but not excessive discovery.

The Court finds Plaintiff's request for discovery to be overly broad and out of line with both Rule 26(b) and the principle that ERISA cases should be decided efficiently and expeditiously. The burden and expense of the massive document production is simply not in proportion to the likely benefits and needs of the case. FED. R. CIV. P. 26(b)(2)(C). And, while some of the items of information requested by Murphy may be relevant and discoverable under the guidelines set forth by the Tenth Circuit, she can obtain much of the information she seeks by means of interrogatories and requests for production.

Therefore, the request to take four depositions is denied. The Court will authorize Plaintiff to take one 30(b)(6) deposition limited to seven hours, and specifically limited in scope to the subject matter set out below. The Court will also permit Plaintiff to serve a maximum of 20 interrogatories and 20 requests for production on Defendant MetLife, directed to the following matters:

> 1. MetLife's guidelines, if any, from June 2006[1] to the present, which (1) define or construe the term "objective medical evidence" as that term relates to degenerative disc disease, and to major depressive disorders; (2) define or construe the term "proof" as used in the policy; or (3) explain whether and how MetLife uses GAF and SDS numbers in its decision process for disability claims.
>
> 2. Whether MetLife issues policies that expressly exclude subjective complaints, and whether it construes the proof necessary to support claims under such policies the same way as it construes policies

---

[1] Murphy alleges she became totally disabled on June 12, 2006. [Doc. 1, at ¶ 9].

9

>without such an express exclusion.
>
>3.  How MetLife structures its compensation for the independent physicians that reviewed Murphy's claim; what steps MetLife took to insulate the independent reviewers from its own financial interest; and any instructions from Metlife to the reviewing doctors as to how to apply given standards of medical evidence.
>
>4.  Description and/or documentation of the policies and procedures used by Metlife to make decisions in its claims assessment process, including any safeguards to ensure against pressure on employees and consulting physicians to deny claims without proper and thorough analysis.

While the Tenth Circuit noted that "a history of biased claims administration" may be a relevant factor in determining the seriousness of the conflict of interest, the Court agrees with Defendants that Plaintiff's Motion demonstrates that she already has a great deal of information about Metlife's history of claims administration. However, the circuit court further noted that evidence of any "pressure on employees or physicians to deny claims without proper analysis" might be relevant to this issue; in addition, the Court finds that Murphy's request for information as to any instructions Metlife may have given the reviewing doctors is likewise relevant to that issue. Therefore, the Court includes these subjects in the permissible scope of discovery, as noted in Nos. 3 and 4 above.

Murphy must serve its written discovery on Defendant MetLife within ten days of the date of this Order.  Within that same period, MetLife may file with the Court evidence related to the above issues, as a supplement to the record.

## **Order**

IT IS THEREFORE ORDERED that the Court hereby vacates its August 20, 2008 Order [Doc. 39] Denying Plaintiff's Motion to Permit Limited Discovery.

IT IS FURTHER ORDERED that Plaintiff's Motion to Permit Limited Discovery [Doc. 22]

is granted in part and denied in part, as described above. Plaintiff must serve its written discovery requests within ten days of the date of this Order.

IT IS FURTHER ORDERED that a Revised Scheduling Order setting forth new case management deadlines will be issued separately.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge